## IN THE COURT OF APPEALS OF IOWA

No. 22-0646
Filed July 20, 2022

**IN THE INTEREST OF C.N.,**
**Minor Child,**

**T.M., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Linn County, Cynthia S. Finley,

District Associate Judge.


        A mother appeals the termination of her parental rights to her toddler son.

**AFFIRMED.**


        Melody J. Butz of Butz Law Offices, PC, Center Point, for appellant mother.

        Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney

General, for appellee State.

        Julie Trachta of Linn County Advocate, Inc. Cedar Rapids, attorney and

guardian ad litem for minor child.


        Considered by Vaitheswaran, P.J., and Tabor and Badding, JJ.

**TABOR, Judge.**

"[N]o one involved in the case believes that [C.N.] would be safe in his mother's care." That realization was the bottom line for the juvenile court in terminating the mother's parental rights to her two-year-old son under Iowa Code section 232.116(1)(h) (2022).[1] The mother appeals, arguing that the Iowa Department of Human Services (DHS) failed to make reasonable efforts to reunify the family. She also contends it was not in C.N.'s best interests to terminate her parental rights. Because the DHS provided ample services, including appropriate visitation, and termination best serves the child's need for safety and stability, the juvenile court properly terminated the mother's parental rights.[2]

## I.    Facts and Prior Proceedings

In December 2019 the DHS completed a child abuse investigation naming two- month-old C.N. as the victim. C.N. had a deep scratch above his ear and symmetrical bruising on his chest and shoulder area consistent with grabbing, squeezing, pinching, or being held down with two hands. Two months later, C.N. again came to the attention of the DHS when he was admitted to the hospital. The child was diagnosed with failure to thrive, caused by inadequate nutrient intake; he also had a concerning cut on his frenulum.[3] Health officials noted that when C.N.

---

[1] The juvenile court also terminated the parental rights of C.N.'s father, but he does not appeal.

[2] We review termination of parental rights de novo. *In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021). We give weight to the factual findings of the juvenile court, though we are not bound by them. *Id.* The State must prove by clear and convincing evidence that termination was proper. *Id.* Evidence is clear and convincing when there are no serious or substantial doubts as to the correctness of the conclusions of law drawn from the evidence. *Id.*

[3] Photos in the record show that the frenulum injury occurred on the membrane beneath the tongue.

was born, he was in the ninety-eighth percentile for weight; but when he was admitted to the hospital that February, he had dropped to the sixth percentile. On February 12 the Iowa Department of Human Services removed C.N. from his parents' care because of that significant weight loss. The next child abuse assessment was founded against the parents for physical abuse; denial of critical care—failure to provide adequate food; and denial of critical care—failure to provide proper supervision.[4]

After a February 21 hearing, the court adjudicated C.N. as a child in need of assistance under Iowa Code section 232.2(6)(c)(2). The court cited the December 2019 child abuse assessment and C.N.'s weight loss as reasons why returning C.N. to his parents' care would be contrary to his welfare. The DHS placed C.N. with his grandparents. After C.N.'s removal the mother began participating in services provided by the DHS and having fully supervised visits with C.N. Because of the COVID-19 pandemic, the DHS changed those sessions to video visits in March and did not return to in-person until June. Services included parenting education, YPN classes, and participation in the SafeCare program.[5] In June 2020 the mother ended her relationship with the father, who is an alcoholic, and that fall moved into a new residence.

In September 2020 the DHS advanced the mother and C.N. to semi-supervised visits. But later that month, the DHS found bruising at the center of

---

[4] The allegation of failure to provide proper supervision was also founded against the child's daycare provider.

[5] The YPN classes included sessions on nutrition, parenting with empathy, shared decision-making, and how to address children's behavior problems. The SafeCare worker explained in her testimony that the program aimed to help the mother learn how to meet C.N.'s needs and properly supervise him.

C.N.'s chest and opened another child abuse assessment. As a result, visits returned to fully supervised. During the time from removal until the first permanency hearing in March 2021, the DHS focused on ensuring the mother was feeding C.N. enough and providing adequate supervision to avoid injury to C.N. The social workers also showed the mother techniques for handling C.N. to avoid accidental harm. On board with the program, the mother attended SafeCare classes to address the injury issues. She also kept a food log and attended YPN nutrition classes to make sure C.N. was eating enough.

At the March 2021 permanency hearing, the court determined that the DHS had not made reasonable efforts because the service providers had failed to do enough contemporaneous teaching—that is, they would observe issues, but rather than correct the mother at that moment, they would send an email *after* the visit outlining concerns. The court extended time for reunification, scheduled a review hearing in October 2021, and set the next permanency hearing for January 2022.

Following the March hearing, the mother proceeded with semi-supervised visits, and by July 2021 visits were again unsupervised. The mother documented all bruises C.N. sustained under her care, most of which she and the DHS ascribed to normal activity for a toddler. The mother noted a few bruises upon C.N.'s arrival into her care that she asked the DHS to investigate. But the DHS believed those marks were also normal injuries for a toddler and did not investigate. The mother also documented and reported some bruising that the DHS did find concerning. But she and the DHS disagreed about the source. For instance, one child abuse assessment first identified the mother as the perpetrator for bruising that she says she reported and argues she could not have caused. The DHS counters that she

documented the bruising but did not report it. Beyond the bruising, the DHS had renewed supervision worries after a worker did a drop-in visit and spotted C.N. in front of the house, out of sight of the mother, who was around the side. Then in mid-July 2021, the DHS noted a troubling bruise on C.N.'s leg and opened a new child abuse assessment. It then moved visits back to fully supervised. Another child abuse assessment arose in February 2022 when C.N. experienced bruising during a supervised visit with the mother.

Competing narratives emerged. On one side, the mother identified a pattern that each time visits progressed, the DHS pointed to unexplained bruising and reimposed supervision. On the other side, the DHS observed that C.N. incurred more injuries when the mother's visits were unsupervised. The mother and the DHS debate the cause of C.N.'s injuries and the mother's culpability. True, all but one of the child abuse assessments for physical abuse identify an "unknown perpetrator," and the mother was appealing the one identifying her as the perpetrator at the time of the final permanency hearing. But two of the assessments for lack of supervision remain founded against the mother. The DHS posits that even without establishing the mother as the perpetrator, the injuries leading to the child abuse assessments for physical abuse still present supervision concerns. Additionally, some of the injuries that the DHS found troubling were documented by the mother but not reported until she was asked about them.

At the October 2021 review hearing, the court found that the DHS had satisfied the reasonable-efforts requirement and the mother had not requested additional services. The mother contends in her brief that she objected to that

finding at the hearing.[6]  The mother filed a "report and request for services" asking for progression of visits and that "suitable others" be allowed to attend the visits. She filed this request in December 2021, one month before the permanency hearing.  After combined permanency and termination hearings in January and March 2022, the juvenile court issued an order terminating parental rights.  The mother appeals.

## II.    Analysis

We usually follow a three-step analysis in termination cases.  First, we must decide whether a ground exists under Iowa Code section 232.116(1) for terminating parental rights.  *In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010).  If so, we examine whether termination is in the child's best interests.  Iowa Code § 232.116(2).   When making that determination we must "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child."  *Id.*  We must then decide whether any factor listed in section 232.116(3) applies to allow us to avoid terminating parental rights. *P.L.*, 778 N.W.2d at 39.

Here, the mother challenges two findings by the juvenile court: (1) that the DHS made reasonable efforts toward reunification and (2) that termination was in C.N.'s best interests.  The court terminated the mother's parental rights under section 232.116(1)(h), which requires the State to show:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.

---

[6] This objection was not included in the record.

(3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.

(4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

The mother does not directly dispute any of these elements. But her challenge to the reasonable-efforts finding implicates the last element of section 232.116(1)(h). *See In re C.B.,* 611 N.W.2d 489, 493 (Iowa 2000) ("The State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent.").

**A. Reasonable Efforts**

When deciding that a child cannot be returned to parental custody, the court must find that the DHS made reasonable efforts toward reunification. Iowa Code § 232.104(1)(c). But reasonable efforts are not "a strict substantive requirement of termination." *C.B.*, 611 N.W.2d at 493. Rather, they are a factor that impacts whether the State has met its burden in showing that the child cannot be returned to the parents. *Id.* While "reasonable efforts" often focus on providing mothers and fathers with services to help improve their parenting, the phrase also includes visitation aimed at helping reunite the family. *Id.* That visitation must be monitored as necessary to protect the child from harm. *Id.*

The mother alleges that the DHS did not make reasonable efforts because it did not offer unsupervised visits with C.N. so that she could showcase her ability to safely care for him. The State counters that "[t]he mother has been given two years of intensive services and, despite enthusiastic engagement in these

services, she has very simply proven unable to demonstrate an ability to keep C.N. safe in her care."[7]

The juvenile court may deny a reasonable-efforts argument when the parent fails to progress through services or incorporate the learned skills into their parenting. *See In re K.M.*, No. 17-0079, 2017 WL 1403647, at *2 (Iowa Ct. App. Apr. 19, 2017) (rejecting a mother's reasonable efforts challenge because she failed to progress in therapy and was not implementing skills she had been learning). C.N.'s mother faces that situation. She has been receiving services for close to two years and yet, despite her stellar record in parenting classes and her commendable work in therapy, she has been unable to keep C.N. out of dangerous situations around the house. The guardian ad litem (GAL) states that "whenever [the mother] has progressed beyond fully supervised interactions that progression has been followed by reports of [C.N.] receiving bumps, bruises, scratches, and other minor injuries or marks while in [the mother's] care." In short, the mother has failed to bring what she has learned about appropriate handling and supervision of toddlers into how she handles and supervises C.N.[8]

The mother also argues that she should have been allowed to have appropriate friends and family members oversee her visits with C.N. But it is unclear if that oversight would have improved the services she was receiving from

---

[7] The State also underscores "repeated problems with C.N. returning from visits— particularly those which are not fully supervised—hungry." And the mother sometimes resisted feeding suggestions offered by professionals, resurrecting concerns from C.N.'s early failure-to-thrive diagnosis.

[8] The mother also disagrees with the juvenile court's finding that she made an inappropriate social media post showing a baby cradle attached to a catapult. We could find no such post in the record and do not consider that finding. Yet other evidence shows that C.N. is not safe in his mother's care.

the DHS. The mother's key concern is that the DHS favored the paternal grandparents, so she needed people who could observe her interactions with C.N. and report fairly to the court. The DHS denied her request, stating that they did not believe the people recommended by the mother would report any safety concerns. Whether or not this is a sufficient reason for denying her request, we are not convinced the mother's proposal would have led to unsupervised visitation. As a means of neutral observation, she installed security cameras in her home to record interactions with C.N. Yet her security footage did not support her argument that her visits should have progressed.

Demands for reasonable efforts must be taken seriously. But they cannot be a stall tactic. When the time frames built into section 232.116(1) have expired and the parent has not met expectations, the child deserves to have the State promptly pursue termination. *In re J.L.W.*, 570 N.W.2d 778, 781 (Iowa Ct. App. 1997), *overruled on other grounds by P.L.*, 778 N.W.2d at 39-40. Our courts can only extend so much patience while parents try to meet a minimum standard of safe parenting. *Id.* Here the statutory period has more than passed and the mother has made little progress on the seminal issue. The facts do not reflect that progression of visits or supervision by third parties would be safe or would help the mother improve her parenting skills. We thus reject her reasonable-efforts challenge.

### B. Best Interests of the Child and Parent-Child Bond

Next, the mother contends it was not in C.N.'s best interests to terminate her parental rights. Even when a statutory ground for termination is met, termination must also be in the child's best interests. *P.L.*, 778 N.W.2d at 37. In

deciding best interests, we do not use our own "unstructured" test. *Id.* Rather, we rely on the framework established in section 232.116(2). *Id.*

The mother argues it is not in C.N.'s best interest to remain with his grandparents. She claims he sustained most of his bruises while with them so he is unsafe in their care. That claim is not supported by the record. At best, the record shows that the mother questioned C.N.'s safety with the grandparents and that she had not been identified as the perpetrator for some of C.N.'s injuries, leaving open the possibility that they were caused by someone else. But that is not proof the grandparents were unsafe caregivers.

After reviewing the record, we believe C.N.'s interests will best be served by termination of his mother's parental rights. He is safe and doing well with his paternal grandparents. He has spent most of his life in their care and at the time of the permanency hearing they were becoming licensed to adopt him.

As part of her best-interests argument, the mother highlights her close bond with C.N.[9] The record confirms that C.N. "does get excited" to see his mother. But a bond is not enough to overcome grounds for termination. The mother must prove by "clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c). In that circumstance the court may choose not to terminate, but need not take that route. *In re A.R.*, 932 N.W.2d 588, 591 (Iowa Ct. App. 2019). When analyzing this factor, we must determine "whether the child will be

---

[9] The mother's argument conflates the best-interests determination under section 232.116(2) with an examination of the bond between parent and child discussed in the permissive factors of subsection (3). *See* Iowa Code § 232.116(3)(c).

disadvantaged by termination, and whether the disadvantage overcomes" the mother's inability to safely parent C.N. *In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010). The mother does not offer clear and convincing evidence that the harm of severing their relationship outweighs the nagging safety concerns of returning C.N. to her care.

And speaking of bonds, C.N. is "very bonded" with his grandparents. In fact, his demeanor is more upbeat when in their care. As the GAL noted, C.N. is quieter, less independent, and more reserved in his mother's care. With his grandparents C.N. is "active, smiling, laughing, silly and acts like a typical active toddler." That difference signals that moving toward adoption will promote his positive emotional growth.

In sum, the DHS made reasonable efforts to reunite the mother and C.N., and it is in the child's best interest to terminate the mother's parental rights. Accordingly, we affirm the termination of parental rights.

**AFFIRMED.**